## DEEP ROCK OIL CORPORATION v. SHERIDAN.

### No. 3713.

United States Court of Appeals
Tenth Circuit.

Jan. 31, 1949.

---

Harold E. Baily, of Chicago, Ill. (W. F. Semple, of Tulsa, Okl., on the brief), for appellant.

Mart Brown, of Oklahoma City, Okl. (Monnet, Hayes & Brown, of Oklahoma City, Okl., McCollum & McCollum, of Pawnee, Okl., on the brief), for appellee.

Before PHILLIPS, Chief Judge, and HUXMAN and MURRAH, Circuit Judges.

HUXMAN, Circuit Judge.

On February 28, 1945, Richard Sheridan, hereinafter called the deceased, died of injuries received while engaged as an employee of Deep Rock Oil Corporation in repairing one of the company's steel tank cars.

On September 7, 1945, Lena Sheridan, widow of the deceased, instituted an action, as administratrix of the decedent's estate in the District Court of Payne County, Oklahoma, against Deep Rock, in which she sought damages in the sum of $2,950, by reason of pain, agony, and mental suffering by deceased prior to his death. The petition recited that the action was brought by her as administratrix of the estate of the deceased and for the use and benefit of the estate, and that he left as his sole and only heirs, his widow and three named sons.

The evidence adduced at the trial was substantially as follows. Deceased, a steel worker, had been an employee of Deep Rock for thirty years. On the day of the accident, he and a co-worker had been instructed by their foreman to repair the outlet leg and valve of a steel tank car. The car had been steamed out the day before to dissipate any gasoline fumes therein. On the morning of the day of the accident, the car was pushed into a shed to make the necessary repairs. The car was standing in a northerly and southerly direction. It was a standard car 42 feet long on which was placed a horizontal tank 6 feet and 7 inches in diameter. On top was a vertical cylindrical dome, 53 inches in diameter, with an opening at the top to permit room to enter the car. Along the side of the tank, mounted on brackets approximately 10 feet from the ground, was a board approximately 6 feet long, 12 inches wide, and 2 inches thick. It was commonly called a dome board. The distance from the center of this board to the crown of the tank car was 44 inches. A steel ladder was attached to the dome board and ran down the side of the tank car to a running board which was approximately at the base of the tank and ran the length of the car. There was also a steel ladder attached at the end of the car by which persons could ascend the car to the board walk along its side.

After the car had been pushed into the shed, deceased's co-worker placed a fourteen-foot ladder against the dome board. The ladder had a 2 inch steel spike in each leg at the base. It was a good substantial ladder with no defects in it. It had no attachments by which it could be clamped to the car at the top. The co-worker, carrying a shorter ladder which was to be placed inside the tank car, followed by deceased, ascended the ladder and entered the car. After remaining inside the tank car about twenty minutes they came out, descended the ladder and attached a long air hose to a pneumatic hammer called a rivet buster, which weighed approximately

twenty-eight pounds. They then again ascended the ladder, the co-worker preceding deceased. The co-worker again entered the car and deceased handed him the rivet buster. The co-worker was in the car from fifteen to twenty minutes making the repair, at the end of which time he handed the rivet buster up to deceased. There was about 10 feet of hose inside the car while the repair was being made. When deceased was handed the rivet buster, he pulled out the hose that had been on the inside of the car.

The only person who saw anything of the accident was another worker working on the underpart of the car. He looked up and saw deceased falling when deceased was about six feet from the ground. He testified that deceased was falling in a southerly direction, with the ladder following him. The ladder fell on top of deceased after he hit the ground. There was some testimony that there was some frost on the dome board when the car was on the outside, but it may be fairly said that there was no frost on the dome board after the car was on the inside and when the employees ascended the ladder and entered the car. There was also testimony that deceased had ascended and descended such a ladder as this one approximately four or five times a day when such work was being done. So also, there was testimony that when ascending such cars, the employees at times used the steel ladder at the end of the car and at other times used a ladder such as this one. It is also quite clear that the choice of ladders to be used in ascending the cars in performing such work was with the employees and that they were not required to ascend cars by use of such ladders.

Plaintiff alleged, as grounds of negligence, that the dome board was frosty and slick; that the ladder had no means of being fastened to the dome board; and that Deep Rock failed to furnish deceased a safe place in which to work and safe appliances to work with and that this was the proximate cause of the injuries. At the close of plaintiffs case, a demurrer to her evidence was sustained and judgment was entered in favor of Deep Rock. An appeal was taken from that judgment to the Supreme Court of Oklahoma.

On February 26, 1946, while the appeal in the first case was pending in the Supreme Court of Oklahoma, appellant, as administratrix of decedent's estate, instituted this action in the same State Court. The complaint alleged that the action was brought for the use and benefit of the widow and three sons of deceased. In this action plaintiff sought damages for the wrongful death of deceased in the sum of $38,934, and for $813.30, for funeral and burial expenses. The complaint charged Deep Rock with the same acts of negligence that were charged in the first action. The action was removed by Deep Rock to the United States District Court for the Western District of Oklahoma. After such removal, Deep Rock filed an answer which, among other defenses, set up the judgment in the first action as a bar to the instant action, asserting that such judgment constituted an estoppel since the question of the company's negligence had been decided by that court adversely to appellee. Deep Rock filed a motion for summary judgment which was overruled by the trial court.

This cause was then tried to a jury. At the conclusion of appellee's testimony, Deep Rock moved for a directed verdict. This motion was overruled. At the conclusion of the trial, the case was submitted to a jury which returned a verdict for appellee for $2,500, plus funeral expenses of $775. Appellee's motion for a new trial was granted but the new trial was limited to the question of damages alone. The new trial resulted in a verdict for appellee this time for $18,000. Judgment was entered thereon and this appeal followed.

After the first trial in this case, but before the motion for a new trial was heard, the Supreme Court of Oklahoma decided the appeal taken from the judgment in the first case.[1] It affirmed the ruling of the trial court in that case in effect holding that appellee had failed to make a case of negligence against Deep Rock but that assuming there was some evidence of negligence, there was a complete failure to show

---

[1] Sheridan v. Deep Rock Oil Corporation, 205 P.2d 276.

a causal connection between the same and the resulting injury.

Numerous errors are urged for reversal. Among these are: (1) That the court erred in overruling appellant's motion for summary judgment; (2) That the court erred in denying appellant's motion for a directed verdict at the conclusion of the evidence; (3) That the trial court erred in granting a new trial limited to the question of the amount of damages alone.

■ It is our conclusion that the trial court erred in refusing to sustain appellant's motion for summary judgment. Two separate and distinct causes of action arose if the injury to and the death of the deceased was caused by the negligence of Deep Rock. One was for injury to his person, such as pain and suffering. This action, under the Oklahoma law survives and may be brought notwithstanding the death of the injured person. 12 Okl.St.Ann. § 1051. The other, an independent cause of action, is for damages resulting from the death of the injured person. The damages in such a case inure to the exclusive benefit of the surviving spouse and children, if any, or next of kin. 12 Okl.St.Ann. § 1053.

Construing these statutes, Oklahoma has held that the two causes of action are coexistent and that a recovery on the one does not bar the institution and maintenance of the other; that the damages to the estate in the one begin with the wrong and end with the death of the injured persons while damages to the designated survivors being with the death, and that they do not cover the same field nor do they overlap.[2]

But Oklahoma has not said that if in the action by the administrator of the estate for injury to the deceased, the administrator fails to recover because of an adjudication of non-negligence in defendant's favor, that the administrator thereafter might maintain the second action and again seek to litigate the question of defendant's negligence.

There is a sharp conflict in the authorities on this question. Thus, Ohio and Massachusetts hold that an adjudication of non-liability in defendant's favor in the first action is no bar to the maintenance of the second action.[3] However, in Keith v. Willers Truck Service, 64 S.D. 274, 266 N.W. 256, 104 A.L.R. 1471, and Frescoln v. Puget Sound Traction Light & Power Co., D.C.Wash., 225 F. 441, 443, it was held that an adverse judgment in the first case was a bar to the prosecution of the second. In the Frescoln case the court said: "The right of recovery in either case is predicated upon some act of omission or commission on the part of the defendant in the discharge of an imposed duty. As set forth in the answer, the judgment of the state court was that the act of the defendant did not cause the death upon which either action was predicated. If the adjudication of the state court could be res adjudicata in this action, then the motion must be denied. 'Can the plaintiff commence an action wherein she seeks to recover damages to herself based upon acts of negligence of the defendant which a competent court has already adjudicated do not exist? While the right of recovery in the instant case is not the same right of recovery as in the other case, each case is predicated upon and supported by the same facts. It would seem to be rather an anomalous situation if a party could predicate a right of recovery and have judgment awarded against him, and die, and his widow thereafter, upon allegations of negligence, institute a proceeding based upon the same act of negligence, and be permitted to litigate over the same facts."

In Keith v. Willers Truck Service, supra, an adjudication in an action by a husband, in his own right for damages for personal injuries, that the defendant was not negligent, was held to be conclusive in another action brought by him as administrator of the estate of his wife for her alleged wrongful death resulting from the same accident where he was also the sole beneficiary. Notwithstanding a contention

---

[2] See St. Louis & S. F. Ry. Co. v. Goode, 42 Okl. 784, 142 P. 1185; Baltimore Am. Ins. Company of N. Y. v. Cannon, 181 Okl. 244, 73 P.2d 167.

[3] See May Coal Company v. Robinette, 120 Ohio St. 110, 165 N.E. 576, 64 A.L.R. 441; McCarthy v. William H. Wood Lumber Co., 219 Mass. 566, 107 N.E. 439.

respecting difference in capacities, the court regarded the representative or fiduciary relationship ordinarily attendant upon the office of administrator as having reached the vanishing point, under such circumstances, and having become nominal, so that, no other interest being involved or represented, the difference should be regarded as a mere fiction.

The Restatement of Law of Judgments, Par. 92, Page 455, provides:

"(1) Where a judgment is rendered for or against a person in his lifetime in an action based on an act which later causes his death,

"(a) a judgment for such person or, if on the merits, against him, precludes an action for causing his death, if an action for causing death is permitted only if the decedent had a cause of action at the time of death, and

"(b) matters adjudicated in the decedent's action are determinative in an action for causing death.

"(2) If two actions are brought, one under a survival or revival statute, and one under a death statute, a judgment in one action

"(a) does not preclude the other action, and

"(b) makes the matters adjudicated therein binding in the other action if, but only if, the beneficiaries of the two actions are the same persons." [4]

In Henderson v. United States Radiator Corporation, 10 Cir., 78 F.2d 674, 675, this court said:

"Any right, fact or matter in issue and directly adjudicated, or necessarily involved in the determination of an action before a competent court in which a judgment or decree has been rendered upon the merits, is conclusively settled by the judgment therein and cannot again be litigated between the same parties and their privies, whether the claim, demand, purpose or subject-matter of the two suits is the same or not. * * *

"To constitute an estoppel under the doctrine of res judicata, the action in which the judgment was rendered and in which it is asserted as an estoppel, must be between the same parties or their privies. But where both the party asserting the judgment as an estoppel and the party against whom it is asserted were parties to the action in which the judgment was

---

[4] "Comment on Subsection (2):

"c. Two actions brought after death of injured party. Under the normal statutes, a judgment under a survival statute includes only damages to the time of the decedent's death, while under a death statute the damages include the harm to the estate resulting from the death and do not include damages for mental suffering and other elements of damages existing before the death. There are therefore two distinct causes of action, one for harm to the decedent before death and one for harm resulting from the death to persons designated by statute. Judgment in one action therefore does not merge the claim set up in the other action and does not, of itself, bar the other action. On the other hand if the two actions are brought on behalf of the same beneficiaries, any matter finally adjudicated in one action becomes res judicata in the other action. If, however, no one of the beneficiaries in one action is a party in the other action, the rules of res judicata do not apply. Likewise, if in the second action there are some beneficiaries not represented in the first action, the rules of res judicata do not apply.

"Illustrations:

"4. A is injured and subsequently dies as a result of B's negligence. He leaves a widow, C, and two children. C brings an action as administratrix of A's estate under a survival statute and also brings an action as the person named to do so for the benefit of herself and children under a death statute. In the action under the survival statute, judgment is rendered in C's favor for $5,000, this being based upon A's pain and suffering during the period he lived, his loss of earning capacity during that time and other similar elements of damages. This judgment does not prevent a judgment in C's favor in the action under the death statute.

"5. Same facts as in Illustration 4, except that judgment was rendered in favor of B on the ground that he was not negligent. If the widow and the two children are the sole beneficiaries of the estate, the adjudication in the action under the survival statute bars a judgment in the action under the death statute."

rendered, it is no objection that such action included some additional parties who are not joined in the action in which it is asserted."

To the same effect, see also New York Life Insurance Company v. Cooper, 10 Cir., 167 F.2d 651. Oklahoma has held that in determining whether the same party is bringing the second action, it will look beyond the nominal party plaintiff.[5]

The first action was brought by appellee as administratrix of the estate. It recited that it was brought for the use and benefit of the estate. It also named the appellee, as widow, and her three sons as the sole and only heirs of the deceased. Any recovery in that action would, therefore go first to the creditors, if any, and next to appellee and her three sons.[6] The creditors, if any, and appellee, as widow, and her three sons were, therefore, the real parties in interest and the action which she maintained in her representative capacity was instituted for their benefit.

The instant action was likewise brought by appellee as administratrix of the estate, for the sole benefit of herself and her three sons. Thus, appellee, individually, and her three sons were present as parties plaintiff in the first action by her as administratrix of the estate, and they are the sole parties plaintiff through the same representation in this action. The fact that the creditors of the estate, if any, were parties plaintiff in the first action by representation and are not so present in this action is of no importance in the resolution of this question. Henderson v. United States Radiator Corp., 10 Cir., 78 F.2d 674, 677.

It is urged that in Baltimore American Insurance Company v. Cannon, supra, the Oklahoma court adopted the Ohio rule that an adverse judgment does not bar the second action by the administrator of the estate. In the first action in the Baltimore case, a judgment was obtained by plaintiff. The sole question before the Supreme Court in that case was whether the two causes were separate and distinct so that the second cause could be independently maintained. This was also one of the questions before the Ohio court in the May Coal Company case, supra, and the Ohio court, likewise, held that two separate and independent causes of action arose from the wrongful death of an injured person. It was in support of its conclusion that there were two separate and distinct causes of action, each of which might be maintained independently of the other, that the Ohio case was cited by the Oklahoma Supreme Court, and the approval of the Ohio doctrine must be limited to the question before the Oklahoma Court. It was not cited to show approval of the Ohio rule that an adverse judgment in the first case does not bar a second action by the administratrix based upon the same allegations of negligence because that question was not before the Oklahoma Court.

It is our conclusion that there was sufficient identity of parties in the two actions so that the adjudication of non-liability in the first action constituted an estoppel against appellee and estopped her from maintaining this action. It follows that the court should have sustained appellant's motion for summary judgment. The conclusion we have reached on this question completely and fully disposes of the case and makes unnecessary a consideration of the other issues presented.

The judgment is, therefore, reversed and the cause is remanded with directions to enter a summary judgment in favor of appellant.

---

[5] In St. Louis S. F. Ry. Co. v. Stuckwish, 137 Okl. 251, 279 P. 683, the syllabus in part reads: "The question of identity of parties in two actions is of substance; parties nominally the same may be in legal effect different, and parties nominally different may be in legal effect the same."

[6] 84 Okl.St.Ann. § 2. See, St. Louis & S. F. Ry. Co. v. Goode, supra.

**FEDERAL SAVINGS & LOAN INS. COR-
PORATION et al. v. THIRD NAT.
BANK IN NASHVILLE.**

No. 10619.

United States Court of Appeals
Sixth Circuit.

Feb. 18, 1949.

W. Raymond Denney, and John K. Maddin, both of Nashville, Tenn. (W. Raymond Denney and John W. Maddin, both of Nashville, Tenn., Kenneth G. Heisler, Ray E. Dougherty, and Opal M. Slater, all of Washington, D. C., and R. O. Barnett, of Baltimore, Md., on the brief), for appellants.

John J. Hooker and E. J. Walsh, both of Nashville, Tenn. (John J. Hooker and E. J. Walsh, both of Nashville, Tenn., on the brief), for appellee.

Before ALLEN, MARTIN and MILLER, Circuit Judges.

ALLEN, Circuit Judge.

Federal Savings & Loan Insurance Corporation, hereinafter called the insurance corporation, and the Fidelity and Deposit Company of Maryland, intervenor, hereinafter called the surety, appeal from a judgment of the District Court which limited the recovery of the insurance corporation to $12,766.32, and dismissed the action as to the surety.

The insurance corporation, pursuant to 12 U.S.C., § 1726(a), 12 U.S.C.A. § 1726(a), had insured the Fidelity Federal Savings and Loan Association of Nashville, Tennessee, hereinafter called the association, and after discovery of a shortage in the association's assets amounting to $32,051.35, due to defalcations of Virgil R. Hall, secretary and treasurer of the association, had contributed that amount to restore the impairment in the capital of the association. The association's claims against the appellee, hereinafter called the bank, were duly assigned to the insurance corporation. The action sets up a claim of conversion by the bank of the association's assets, breach of the bank's contract with the association, misrepresentations made to the insurance corporation's examiners by the bank, its liability as a joint tort-feasor with Hall, and its acceptance of trust funds to reimburse itself for personal indebtedness of Hall. The surety filed an intervening petition praying for the recovery of $10,000 paid by it upon a fidelity bond on Hall in favor of the association.

The District Court originally dismissed the action upon the ground of lack of jurisdiction, 60 F.Supp. 110, considering that the case was between citizens of the same state, and presented no violation of Federal law. This court reversed the judgment, 153 F.2d 678, holding that the allegations of the complaint, if proved, established a violation of the provisions of 12 U.S.C., § 1731(e) [now 18 U.S.C.A. § 1008], that civil sanctions lie for such violations, and that the case therefore arises under federal law.

While the claimed shortages amounted to over $50,000, the insurance corporation

limited its prayer for recovery to the amount contributed, namely, $32,051.35. Upon the trial the District Court granted recovery to the insurance corporation upon the third and fifth claims of the complaint only, totalling $12,766.32, and dismissed the action as to the surety company. The bank does not appeal from the judgment against it.

The appeal attacks so much of the judgment as disallows $18,484.13 of the recovery sought, and interest, and as dismisses the intervening petition of the surety.

The insurance corporation set up the following claims of relief in its complaint, as amended:

(1) For the sum of $10,000 because of the improper charge by the bank on September 20, 1940, of the unauthorized check dated September 10, 1940, against the association's account, and the illegal conversion of this sum to pay the personal indebtedness of Hall to the bank.

(2) For the sum of $15,945.66 because of the improper charge-back by the bank on September 13, 1940, of the two checks dated September 10, 1940, which it had accepted as a deposit to the association's account on September 10th or 11th.

(3) For the sum of $10,000 because of the improper charge by the bank on October 9, 1940, of the unauthorized check dated September 26, 1940, against the association's account, and the illegal conversion of this sum to pay the personal indebtedness of Hall to the bank.

(4) For the sum of $11,456.83 for fraud and deceit of the bank practiced on the insurance corporation's examiners in connection with the 1940 examination and audit of the association in violation of the provisions of § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008], which sum was embezzled after the insurance corporation was prevented from discovering Hall's shortages by the bank's false statement and certificate.

(5) For $3,000 on the Daniel Wakefield Hale note and mortgage belonging to the association which was taken as collateral by the bank for a personal loan to Hall.

(6) For $32,051.35 (limited by the testimony to $31,250.95) for the fraud, deceit and misrepresentation by the bank to the insurance corporation's examiners, and the illegal course of conduct and dealings adopted by the bank with Hall in dealing with the funds, accounts and records of the association from July 12, 1939, to January 31, 1941, in violation of § 1731(e), 12 U.S. C. [now 18 U.S.C.A. § 1008].

(7) For the sum of $12,660.20 because of the improper charge-back of the Wrenne check against the association's account on October 10, 1940, after the bank had accepted it as a deposit on September 27, 1940, and the bank's actions in connection therewith.

A further claim for $3,029.25 was presented at the trial based upon the fact that the bank accepted the Alma Lewis check, on a forged and restricted endorsement, as a deposit to the Allen & Hall Realty Company's account, and that the amount thereof was transferred on the same day to the bank by check to pay Hall's personal indebtedness.

The bank, in addition to general denials, claimed that certain of the deposits were conditional; that no damage was shown, and that the bank was absolved of liability because of the negligence of the association.

Appellant's contention here is that the conceded facts establish the right of the insurance corporation to recover upon all of the claims set forth in the complaint. It urges that the following facts, on which it bases its claims, are established by the evidence.

The association was organized in May, 1937, with Virgil R. Hall its secretary and treasurer and dominant executive officer. Neither the president nor any member of the board of directors ever checked Hall's financial transactions. The minutes of the directors' meetings, which were required to be held monthly, were often omitted and Hall would write them up from memory for the purpose of examination by the examiners of the insurance corporation. The association carried its chief bank account in the bank, and its signature card on file with the bank during the entire period provided that the authorized signature of the association should be by Virgil R. Hall, with a counter-signature by G. A. Harring-

ton, president, or J. L. Blakemore, vice-president.

During the same period Hall managed and in part owned the Allen & Hall Realty Company. The bank carried the account of Virgil R. Hall, Agent, the account of Allen & Hall Realty Company, and the account of the association, all of which were handled by D. W. Johnston, assistant vice-president and assistant cashier of the bank. Johnston and Hall were old acquaintances, both having come to Nashville from Dickson County, Tennessee. All transactions of the association with the bank that were not of a routine nature were handled by Johnston, and, in general, in accordance with the requests and instructions of Hall.

On July 13, 1939, the examiner of the insurance corporation, acting under the statute (12 U.S.C., § 1724 et seq., 12 U.S.C.A. § 1724 et seq.), came to the association's office to audit its accounts. The bank gave the examiners a certificate dated July 13, 1939, showing the association's balance in the bank at closing on July 12, 1939, to be $34,163.89. A bank statement was submitted with the certificate showing the same balance and including a deposit of $18,462.69, shown in the statement to have been made July 12, 1939. The deposit slip, dated July 10, 1939, included two checks for $2,951.32 and $4,003.96 respectively, drawn on the Allen & Hall Realty Company's account in the bank. When these checks were charged to the Realty Company on July 14, 1939, its account was overdrawn in the sum of $7,117.37. The deposit also included $11,000 cash, the proceeds of a loan made by the bank to the Realty Company with no security except Hall's personal endorsement. The bank's records showed that this loan was made on July 14. The examiners, after receiving the statement and certificate, found the association's account to be in balance. On August 4th the Allen & Hall loan of $11,000 was paid in full, and on the same day Hall set up two loans on the association's books, which together with the one set up on July 24, totaled $12,200. During the period from July 14th to July 24th, except for two days, the Realty Company's account was overdrawn from $2,000 to $7,000.

For a number of years Hall's account had an average daily balance of about $50, and never exceeded $300. From July 26, 1940, to September 19, 1940, his balance was $5.51.

On September 11, 1940, the examiners again came to the association's office for an examination and audit. They took the cash in the office, counted it, requested a statement of the association's account, and left the regular certificate form with the bank to ascertain the amount on deposit to the association's credit at closing on September 10th.

Hall's loans at the bank on September 19, 1940, aggregated $12,660.20, and he was short in his cash accounts as treasurer of the association in the amount of $25,945.66. Hall made two deposits to the credit of the association in the bank, as he states, on the morning of September 11, 1940, one for $13,297.52, the other for $17,816.49. The books of the bank show that these deposits were made on September 11th, and Hall made them, as he says, knowing that the examiners "were in the vicinity of Nashville."

Included in the deposit of $13,297.52 was $10,000, listed as currency, which represented the proceeds of a personal loan to Hall made at that time by the bank. The note given for the loan was dated September 10, 1940. Johnston did not refer this loan in advance to the bank's loan committee, as was customary, and he approved it after Hall told him he was "about due for an examination." Hall at the same time drew a check for $10,000 on a counter check of the bank dated September 10, 1940, payable to the bank. This check was drawn on the association's account and signed by Hall without countersignature. It was charged against the association's account by the bank on September 20, 1940, and Hall's note was paid with the proceeds.

The $17,816.49 deposit included two checks drawn by Hall on his account in the bank, one for $9,040.25 and the other for $6,905.41. On September 13th the bank charged the two checks, not against the Hall account, but against the association's account and then returned the checks to Hall. On the certificate form which the

examiners had submitted the bank certified that $32,470.52 was on deposit to the credit of the association at closing on September 10, 1940. The statement showed the same amount and listed the two deposits made by Hall as having been made on September 10th. However, the bank's books showed the deposits as having been made on September 11th, and showed a balance of $1,356.51 at closing on September 10th. Moreover, the $10,000 check was not listed as an outstanding liability of the association in the space provided on the certificate for this information.

Using the figures certified, the examiners found the books of the association to be in balance. They interrupted their examination and left Nashville on September 17th. They reappeared in Nashville on September 26, 1940, again counted the cash, and requested a certificate from the bank as to the amount on deposit to the association's credit at closing on September 25, 1940, together with a bank statement from September 11 through September 25.

At the request of Hall, and with the knowledge and authorization of Johnston, the bank prepared and furnished the examiners a statement which omitted the September 13 and September 20 charges of $15,945.66 and $10,000 respectively. This made the closing daily balances on the statement which the bank prepared and furnished the examiners differ from the bank's records as follows:

| LEDGER CARD MAINTAINED BY BANK | | STATEMENT PREPARED BY THE BANK AND FURNISHED EXAMINERS |
|---|---|---|
| Sept. 10 | $ 1,365.51 | $32,470.52 |
| Sept. 11 | 31,826.07 | 31,826.07 |
| Sept. 13 | 15,852.31 | 31,797.97 |
| Sept. 14 | 15,814.23 | 31,759.89 |
| Sept. 16 | 15,686.23 | 31,631.89 |
| Sept. 20 | 4,426.23 | 30,371.89 |
| Sept. 23 | 4,416.23 | 30,361.89 |
| Sept. 25 | 4,216.23 | 30,161.89 |

The certificate handed the examiners by the bank stated that $30,161.89 was on deposit to the credit of the association at closing on September 25, 1940. It was the practice of the bank to give statements to examiners and customers desiring them

which were exact duplicates of the bank's records. The certificate form furnished by the examiners expressly asked for "balance in regular checking account at closing (effective date of examination) September 25, 1940." No outstanding obligations were listed and, while the cancelled checks which supported the charges shown on the statement were given the examiners, the cancelled check for $10,000 which the bank had charged against the association's account on September 20 was not given them.

The association's ledger account in the bank shows two deposits, one for $15,945.66 and one for $10,000, made on September 26, 1940. The deposit slip lists a $10,000 item and a $15,945.66 item, the proceeds of loans made to Hall personally. Hall told Johnston at the time he deposited the $15,945.66 that the examiners were there and he wanted his assets to appear better than they did. Later in the day Hall came back and said "I must fix that Fidelity Federal note" and borrowed $10,000 more. Hall again gave the bank as security for his $10,000 note a counter check signed by him on behalf of the association without countersignature, drawn on the bank and payable to it, dated September 26, 1940. This was charged to the association's account on October 9, 1940, and the proceeds used to pay Hall's note to the bank. The collateral furnished to secure the note covering the deposit of $15,945.66 consisted of notes and mortgages, but the bank kept no record describing these. One of them was later shown to be a $2,700 note payable to the association executed by Daniel Wakefield Hale, secured by a recorded first deed of trust on the property therein described. Hall had endorsed the note to the bank purportedly for the association. A substantial part of this loan was repaid by checks drawn upon the Allen & Hall Realty Company's account, and checks in amounts identical with the Allen & Hall deposits were charged against the association's account.

On or about September 13, 1940, Hall marked the three loans, now aggregating $12,660.20, "paid," and placed a check of the Wrenne Mortgage Company drawn upon the bank, dated September 13, 1940, for $12,660.20 with the other cash items in the

association's office. Wrenne left the check with Hall with the understanding that it would not be cashed until a sale of certain mortgages was completed and the mortgages turned over by Wrenne to customers who were available, as otherwise there would not be sufficient on deposit to cover. The examiner conducting the 1940 examination caused the association to deposit all the cash items found in the office when he returned, including this check, and accompanied Hall to the bank when the deposit was made on September 27, 1940.

Wrenne testified that Hall telephoned him on the morning of the 27th that the examiners had deposited the check; that he and Hall went to the bank that morning and that he told Cockrill, the bookkeeper that the check was deposited by mistake, that the purpose of the check had not been consummated and that he did not want it paid; that he then went back to his office leaving Hall at the bank. He did not secure the check nor sign a stop payment order.

Cockrill testified that Wrenne and Hall brought the check to him and Hall requested him to "pay" it but not to show it to any of the officers because he did not want to embarrass Mr. Wrenne who would make a deposit that afternoon or the next day to cover. Cockrill showed the check to Johnston and told him of Hall's request. The check was credited to the association's account on the bank's books as of September 27, 1940, and debited to the association on October 10, 1940. At no time between September 27 and October 10 were there sufficient funds in the account of the Wrenne Mortgage Company to pay this check.

Johnston testified that between September 27 and October 10 the Wrenne check was carried as a bank asset. The bank's auditor testified that it was carried as a cash item by the bank to balance the credit to the association's account. The September 30th bank statement rendered the association included the amount of the Wrenne check in the September 30th balance.

Bradrick, the examiner, questioned Johnston a few days after the check was deposited to ascertain whether it had cleared. He testified:

"It being the major portion of that deposit and being one check, it is customary to determine whether or not it had cleared and was paid, and after allowing a reasonable time for that to take place I called at the office of the Third National Bank * * * and was referred * * * to Mr. Johnston * * * and he advised me that it was involved in a real estate transaction and would be cleared in the course of a day or two, and either I suggested or he did that I call back, which I did in the course of two or three days, I don't recall which. At that time I contacted Mr. Johnston directly and it happened, as I recall that meeting, that he was occupied at the time with a gentleman at his desk, and when he turned to me he volunteered the information before I asked for it that the check, that that matter, was closed and I inquired specifically whether or not the particular check I was interested in had cleared and he told me it was in that day's business and was a closed matter as far as the Fidelity Federal was concerned, which I accepted as a fact.

"Q. You said 'a closed matter as far as the Fidelity Federal was concerned,' did he make that statement to you? A. That is the meaning I placed upon it. He said it was in that day's business and the matter was closed.

"Q. His exact words were that it was in that day's business? A. That is right."

Both Bradrick and Smith, another examiner in charge of the 1941 examination, testified that Johnston told them in the presence of each other and of the attorney for the association, during the January, 1941, examination that it was his intention in the last conversation he had with Bradrick about the Wrenne check to leave the impression that the check was good. Johnston puts a different interpretation on the conversation. The examiners completed their audit and left Nashville on October 5th. The check was debited to the association on October 10th. The examination disclosed no shortages except an item of $340.50.

On October 28th, $6,000 was paid by check of the Realty Company as a credit on Hall's loan of $15,945.66. This included the proceeds of an association check for $3,029.25, properly drawn and countersigned, payable to Alma Lewis, to be delivered to her in connection with a loan upon the property already encumbered with the Hale mortgage. The Lewis loan was entirely fictitious and never consummated, but Hall set it up on the association's books and deposited the check in the Realty Company's account in the bank. The endorsement of Alma Lewis' name was forged.

In January, 1941, Hall admitted to Johnston that there were discrepancies in the association's office accounts, and later admitted substantial shortages. An audit of the books as of the close of business on January 31, 1941, disclosed a gross cash shortage of $38,626.27, and a net cash shortage of $31,250.95. The insurance corporation prays for recovery only of the amount of its contribution plus interest.

At the conclusion of the evidence, each party moved for directed verdict. The District Court considered that there was "hardly any dispute about the facts," saying, "In connection with the two $10,000 checks and the transactions that took place about that time, there was no dispute about the facts in those instances. The only dispute in this case was whether or not the bank was acting fraudulently or in good faith in connection with the Wrenne check. * * *" The court then decided a number of questions of fact, and held that the appellant was entitled to recover on claims 3 and 5 of the amended complaint, totaling $12,766.32, and denied recovery on the other claims. It subsequently stated that the jury's verdict on the question of good faith "would have a great deal to do with whether or not I allow interest on these items which I have already indicated that the Bank is liable for." The court accordingly submitted to the jury the following questions:

"1. Did the Third National Bank or any officer thereof intentionally do any act tending to deceive the Examiners about the true condition of the Fidelity Federal Savings & Loan Association, or did the Third National Bank and its officers act in good faith in these transactions?

"2. Did the Third National Bank or any officer thereof do any act which was the proximate cause of any loss to Fidelity Federal Savings & Loan Association arising out of the handling of a check of Thomas A. Wrenne & Company?"

The jury found in favor of the bank upon both questions.

On August 15, 1947, the court entered a decree, reciting the verdict of the jury, overruling the insurance corporation's motion for findings of fact and conclusions of law, and directing "that the record now show that the jury was directed to return a verdict in favor of the plaintiff in said sum of $12,766.32, and that a judgment be entered upon such verdict of the jury." Interest was denied on the amount of the recovery, and since the claim of the surety was subordinate to the claim of the insurance corporation, and the judgment rendered was less than the amount of the insurance corporation's superior claim, the intervening petition of the surety was dismissed.

The applicable statute is § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008], the material portions of which are as follows: "Whoever, for the purpose of inducing the insurance of the accounts of any institution by the Federal Savings and Loan Insurance Corporation or for the purpose of obtaining any extension or renewal of such insurance by said Corporation or for the purpose of influencing in any way the action of the said Corporation under this chapter, makes, passes, utters, or publishes, or causes to be made, passed, uttered, or published, any statement, knowing the same to be false * * *, or willfully overvalues any security, asset, or income, of any institution insured or applying for insurance by said Corporation, shall be punished by a fine of not more than $5,000, or by imprisonment for not more than two years, or both."

In an action to enforce civil penalties based upon a violation of § 1731(e), the motive of the bank is immaterial. As held in D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 460, 62

S.Ct. 676, 681, 81 L.Ed. 956, a case which construes a similar section of the Federal Reserve Act [§ 264(s), 12 U.S.C. [now 18 U.S.C.A. § 1007], the test here is whether the false statements were designed "to deceive the creditors or the public authority, or would tend to have that effect." Also, if the making of the statements was shown, and that they were false, together with the fact that the public authority was deceived or tended to be deceived, the bank was liable for the deposits which it credited to the association, regardless of specific damage. Deitrick v. Greaney, 309 U.S. 190, 198, 60 S.Ct. 480, 84 L.Ed. 694.

Also pertinent are the following general rules of law applicable to banking transactions:

 When a bank unconditionally deposits checks drawn on itself to the credit of a depositor, the effect is the same as if it had cashed the checks and deposited the proceeds. When a check is presented for deposit, drawn on the depositary bank, the bank may refuse to pay it, or take it conditionally by express agreement or by usage, if usage exists; but if it pays the money or gives credit to the depositor, the transaction is closed between the bank and the depositor unless the check proves to be not genuine or there is fraud against the bank on the part of the depositor. The giving of credit is practically and legally the same as paying the money to the depositor and receiving the cash again on deposit. American National Bank of Nashville v. Miller, 229 U.S. 517, 520, 33 S.Ct. 883, 57 L.Ed. 1310; National Bank v. Burkhardt, 100 U.S. 686, 689, 25 L.Ed. 766; In re Ruskay, 2 Cir., 5 F.2d 143; Lebanon Bank & Trust Co. v. Grandstaff, 24 Tenn. App. 162, 141 S.W.2d 924; 2 Morse on Banks and Banking (6th Ed.), § 569.

A bank cannot look to the depositor of the check for reimbursement. It may only charge the drawer of the check. Hayes v. Tootle-Lacy National Bank, 10 Cir., 72 F.2d 429, 432; American National Bank of Nashville v. Miller, supra.

 Also, when a bank pays a debt owed by an individual to the bank with a corporate check drawn by the individual debtor, the bank becomes liable for con-

version. National Bank v. Insurance Co., 104 U.S. 54, 26 L.Ed. 693; U. S. Fidelity & Guaranty Co. v. Union Bank & Trust Co., 6 Cir., 228 F. 448; Grace v. Corn Exchange Bank-Trust Co., 287 N.Y. 94, 105, 38 N.E.2d 449, 145 A.L.R. 436. When it has notice that the checks of a corporation are issued for a third party's personal use, it pays the checks at its peril. Havana Central R. Co. v. Central Trust Co., 2 Cir., 204 F. 546; Federal Savings & Loan Ins. Corp. v. Kearney Trust Co., 8 Cir., 151 F.2d 720.

The bank insists that it is not liable because the defalcations of Hall and the negligence of the association in failing to place any check on Hall's activities were the proximate cause of the loss, and that if it is liable for the items upon which judgment was given against it, the findings of the jury cleared it of further responsibility. The bank did not appeal from the judgment and hence the question of its complete nonliability is not preserved.

 Nor do the findings of the jury release the bank from responsibility. D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., supra, 315 U.S. at page 460, 62 S.Ct. 676, 86 L.Ed. 956; Deitrick v. Greaney, supra, 309 U.S. at page 198, 60 S.Ct. 480, 84 L.Ed. 694.

 The insurance corporation contends that under the undisputed evidence judgment should have been rendered in its favor on all items involved. We think that the judgment must be reversed and a new trial ordered. This record presents evidence, much of it documentary and from the bank's own records, tending to show that the bank violated § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008], and is therefore subject to civil sanctions arising thereunder, Federal Savings & Loan Ins. Corp. v. Third National Bank, 6 Cir., 153 F.2d 678; also evidence to the effect that the bank breached its contract of deposit; and that the bank gave substantial assistance to Hall in his wrongdoing and thus became joint tort-feasor with Hall, to the damage of the association.

The District Court failed to consider in its findings or to submit to the jury any question arising out of the violation by the

bank of § 1731(e), 12 U.S.C., 12 U.S.C.A. § 1731(e), although this court had previously held in this case that the federal court has jurisdiction of civil sanctions under § 1731(e), 12 U.S.C. [now 18 U.S. C.A. § 1008] [153 F.2d 678], and had indicated that a cause of action under that section was stated, and thus had established the law of the case. Appellant's evidence on this phase of the controversy has been previously reviewed, and presented a jury question under appropriate instructions.

The fact, if established, that the bank intentionally made false certificates which padded the assets of the association, and thus covered up shortages, as the District Court found, "with the purpose of assisting Hall," constitutes a violation of § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008]. The bank is presumed to intend the natural and probable consequences of its acts, and proof of motive was unnecessary. Dunlap v. United States, 7 Cir., 70 F.2d 35.

Also evidence was given tending to establish damage in the amount of at least $50,-000. Between September 10, 1940, and January 1, 1941, the bank charged this amount to the association's account, having already credited it to the association on checks or obligations of other persons.

The theory advanced by the bank that the giving of the two checks for $10,-000 each, drawn by Hall on the association's account, constituted in each case a bona fide conditional deposit, presents a question for the jury.

Each of the checks was entered by the bank in the association's account and in the bank statements presented to the examiner with each certificate the bank showed the items as listed to the credit of the association. The association later checked out on these deposits in the ordinary course of business. It was a question for the jury whether by its statements and certificates the bank evidenced a clear intention to treat the transactions as payment of money and receipt of the cash on deposit and hence is estopped to assert that these records do not reflect the true transaction. Cf. Deitrick v. Greaney, supra.

The same considerations apply to the Wrenne Realty Company check for $12,-660.20. While between Wrenne and the bank the deposit of this check was conditional, it is a question for the jury whether the deposit was absolute or conditional between the bank and the association.

The finding of the jury on the first question submitted to it must be vacated because the question was submitted in improper form. The question should present the issue of whether the bank made the statements and certificates for one of the purposes specified in the statute "knowing the same to be false" as required by the wording of the statute.

The question so drawn corresponds exactly to the provisions of § 1731(e), 12 U.S.C. [now 18 U.S.C.A. § 1008], and the ruling of the Supreme Court in D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., supra, 315 U.S. at page 460, 62 S.Ct. 676, 86 L.Ed. 956. The statute does not require evidence of bad faith in such transactions, and the inclusion of this requirement in the first issue submitted to the jury was material error requiring the setting aside of the verdict upon that point.

The judgment is reversed, and the case is remanded for new trial upon all claims except 3 and 5 with direction to the District Court to charge the jury, in accordance with this opinion, upon all issues of fact submitted to it.

## LINQUATA v. UNITED STATES.
### No. 4312.

United States Court of Appeals
First Circuit.

March 9, 1949.

Writ of Certiorari Denied May 31, 1949.

See 69 S.Ct. 1157.

Harry Bergson, of Boston, Mass., for appellant.

W. Arthur Garrity, Jr., Asst. U. S. Atty., of Boston, Mass. (William T. McCarthy, U. S. Atty., of Boston, Mass., on the brief), for appellee.

Before MAGRUDER, Chief Judge, WOODBURY, Circuit Judge, and CONNOR, District Judge.

WOODBURY, Circuit Judge.

The basic question on this appeal from a judgment sentencing the defendant to three concurrent terms of imprisonment, and fining him $1,000, is whether on the evidence taken as a whole the jury were warranted in finding beyond a reasonable doubt that the defendant had wilfully attempted to evade or defeat his income taxes for the years 1942, 1943 and 1944 by falsely and fraudulently understating his net income in the returns which he filed for those years as charged in a three-count indictment drawn under 26 U.S.C.A. § 145(b).

The defendant-appellant is a commercial fisherman who during the years in question was the captain of the fishing boat "Natalie III." During 1942 the boat, carrying a crew of nine including the captain, engaged principally in dragging for ground fish, and during 1943, and 1944, carrying a crew of fifteen including the captain, it engaged principally in seining for mackerel. When ground fishing the boat operated on what is known as the "60-40 lay", and when seining it operated on what is known as the "Italian lay." Under these systems of operation the costs allocable to each trip, such as the cost of the food, ice, and fuel consumed thereon, are first deducted from the gross proceeds of the catch made on the trip and then the balance remaining is divided proportionately between the owner of the boat and the men on board. On the "60-40 lay" 40% of the net proceeds of each trip go to the owner of the boat and 60% to the crew, including the captain, in equal parts, and on the "Italian lay" the net proceeds of each trip are divided into equal shares, one for each member of the crew, including the captain, and six for the owner of the boat. Thus when the "Natalie III" was seining, and hence operating on the "Italian lay", with a crew of fifteen men including the captain, the net proceeds of each trip were divided into twenty-one shares, one for each man on board and six for the owner of the boat, and when she was ground fishing, and hence operating on a "60-40 lay", with a nine man crew, each

man received about 7 percent of the net proceeds of the catch and the owner 40%. On the "Italian lay" the boat owner's share was obviously exactly six times that of a crew member, and on the "60-40 lay" the proportionate difference between the boat owner's share and that of a crew member was approximately the same.

In his returns for each of the years in question the defendant, who was on the cash-calendar year basis, reported a figure as his receipts as a crew member, and another figure exactly six times greater as his receipts as owner of the boat, and calculated his taxes on the sum of these two figures less his deductions. At the trial he testified that although he reported the entire boat owner's share of the catches made by the "Natalie III" as his own income, he was not in fact the sole owner of the boat but actually owned only a quarter of it, and received only a quarter of the owner's share. He said that he reported the entire boat owner's share as his because the person who helped him make out his returns advised him to do so for the reason that his father Marco, who owned half the boat, was aged, infirm, and could neither read nor write, and his nephew Thomas, who owned the remaining quarter was a minor. The defendant's tax adviser, however, testifying as a witness for the Government, denied this. He said that the defendant told him that he was the sole owner of the "Natalie III" and that he made out the defendant's returns on the basis of this information.

The Government takes the position that the defendant reported the entire boat owner's share as his income because in fact he was the sole owner of the boat, and then to prove that the defendant had understated his income for the years involved it introduced evidence of the payments made by various wholesale fish companies for the fish taken by the "Natalie III" during 1942, 1943, and 1944. Calculations from this evidence make it abundantly clear that the jury could well find beyond a reasonable doubt that if the defendant had in fact received the entire boat owner's share during the years in question, then he had grossly understated his income in his returns for those years. But from the Government's evidence it is equally clear that if the defendant had received during those years only one quarter of the boat owner's share, as he claims, then by reporting what he set out as the entire boat owner's share he in fact overstated his income for 1942 and 1943, and understated it only slightly for 1944. Thus the ownership of the "Natalie III" was one of the major issues at the trial upon which both sides introduced considerable evidence. But this issue is no longer in the case for the defendant now concedes that the jury had a right on the conflicting evidence introduced at the trial to find that the defendant was indeed the sole owner of the boat. His contention on this appeal is that even if the jury did find him to be the sole owner of the boat, that finding is not sufficient to warrant the inference that beyond a reasonable doubt he actually received the entire boat owner's share of the income, and that the court below in charging the jury that it had the right to draw that inference committed serious prejudicial error.

It is quite true that there is no direct evidence that the defendant actually received the entire boat owner's share of the net proceeds of the catches made by the boat during the years involved. The evidence with respect to the disposition of that share is as follows: It was the practice on the "Natalie III", when she came in from a trip and her catch was sold, for the crew member designated as the purser to take the check given in payment for the catch to a bank, have it cashed, and return on board with the proceeds. There the money was taken into the forecastle and in the presence of the crew, or at least of such members of the crew as wished to attend, the money necessary to defray the expenses of the trip was counted out and laid to one side, and then each man's and the owner's share, if on the "Italian lay", or percentage, if on the "60-40 lay", was calculated and counted out into separate piles.

The evidence is that the defendant was not often present in the forecastle when the proceeds of a catch were counted out and distributed. But his share as a crew member was usually, if not invariably, taken to him in the wheel house, or on deck, or wherever else on board he might happen to be, by some member of the crew. At any

rate he concedes that during the years involved he actually received all that was due to him as the captain and a member of the crew of the "Natalie III."

Apparently, however, neither the entire boat owner's share nor any part of it was ever delivered to the defendant with his share as a crew member. All that appears is that the purser of the boat sometimes delivered the boat owner's share to the bookkeeper of a wholesale fish company, who as a side line kept some records and books for the defendant, who deposited it in a checking account carried in a local bank in the boat's name, and sometimes the purser delivered it directly to the defendant's father. The evidence as to the ultimate disposition of this share by the defendant's father and from the checking account is fragmentary. There is direct testimony from the defendant himself that he received in cash one quarter of "the money that was taken to my father's house," and there is also evidence that from time to time he also received one quarter part of "splits", or distributions, made of the balance of the money remaining in the checking account after the payment therefrom of taxes on the boat and expenses incidental to its upkeep. Thus there is no direct evidence of actual payments to the defendant of more than a quarter of the boat owner's share.

The Government's contention that the defendant actually received the entire boat owner's share, however, does not rest, as the defendant contends, solely upon the evidence, which the jury evidently believed beyond a reasonable doubt, that the defendant was the sole owner of the boat. There is testimony in the record from two Internal Revenue officials that while the defendant was under investigation by them he not only admitted that he was the sole owner of the boat, but also that "he got six shares in addition to his own share as a member of the crew;" that no one "else participated in the profits or the distribution of the income," and that "the profits were not split with anyone else." Furthermore an admission by the defendant that he received the entire boat owner's share is implicit from the way his returns were made out.

These admissions, coupled with the evidence that the defendant actually owned the boat and the evidence that the owner's share of the net proceeds of its catches far exceeded the amounts reported as such by the defendant in his returns, seem to us amply sufficient to warrant submission of the Government's case to the jury.

The defendant contends, however, that when the court below told the jury: "Now, if you should decide that he was the sole owner of the boat, you would have sufficient evidence, it seems to me, to conclude that he was not only the owner but that he actually received the money," it committed serious prejudicial error for the reason that "In effect the court charged the jury as a matter of law that mere ownership is synonymous with actual receipt of the monies which belong to ownership." The specific contention is, of course, refuted by the words "it seems to me." But the defendant also contends that the sentence constituted an erroneous statement of law because, he says, mere evidence of ownership of an income producing piece of property "is not of itself enough to sustain the burden of proof required in a criminal case to show receipt" of the income produced by the property by the owner of it.

We do not pause to consider the validity of the general proposition advanced, for in the case at bar, as already noted, in addition to the evidence that the defendant owned the boat, we have the evidence of his admissions that he received the entire owner's share of the net proceeds of its catches. And from the context in which the sentence objected to appears in the charge we do not think the jury must have understood it as a statement of the general proposition that a mere finding of ownership standing alone would support a finding that beyond a reasonable doubt the defendant had actually received the income normally incidental to ownership. For immediately preceding the sentence objected to the court told the jury to "take into account all the matters in evidence," including the defendant's "own statement under oath when questioned by the Internal Revenue officials after he knew that he was under investigation," and in the paragraph following it the court told the jury: "Should

you reach the conclusion that he actually received the money and was the sole owner of the boat, you could bring in a conviction on each of the three counts for the years 1942, 1943 and 1944. I do not say you should. I merely say you could."

The defendant's other objections have been considered but we find them without merit.

The judgment of the District Court is affirmed.

## TSANG v. KAN.

### No. 11891.

United States Court of Appeals
Ninth Circuit.
Feb. 11, 1949.

As Amended March 25, 1949.

Robert E. Hatch, of San Francisco, Cal. (Lemuel H. Matthews, of San Francisco, Cal., of counsel), for appellant.

Frank J. Hennessy, U.S. Atty., and Rudolph J. Scholz and Joseph Karesh, Asst. U.S. Attys., all of San Francisco, Cal., for appellee.

Before DENMAN, Chief Judge, STEPHENS, Circuit Judge, and BOWEN, District Judge.

DENMAN, Chief Judge.

This is an appeal from a judgment for the appellee, a returned veteran, for lost wages due to the failure of appellant to restore him to his employment prior to his war service, he having waived restoration to his former position. The identical issue had been adjudicated against appellee in a suit between the parties in the Superior Court of the State of California in and for the City and County of San Francisco. There the employer, appellant, sought a judgment declaring his obligation to the appellee veteran, and he, instead of seeking a dismissal on the ground that the G. I. Bill of Rights gave him the right to choose his own forum, cross-complained and sought affirmatively from the state tribunal a judgment for his wages.

The district court held that the veterans' bill gives no jurisdiction to the state courts to adjudicate any of the rights conferred on the veteran. The appellant assigns as error this holding.

Congress in the G. I. Bill of Rights, Sec. 308(b) (B), gives the returned veteran the right of restoration to a position he had occupied and to wages as follows:

"If such position was in the employ of a private employer, such employer shall restore such person to such position or to a position of like seniority, status, and pay unless the employer's circumstances have so changed as to make it impossible or unreasonable to do so".

It also gives him a second right, in Sec. 308(e). That is the right to sue in the United States district court for an amount less than $3,000, free of costs and with the United States Attorney as his counsel. The question is, Does this second right so to sue in the United States district court deprive him of the right to sue in the state courts?

■ The mere giving of such jurisdiction to the federal courts does not thereby exclude that of the state courts. This was clearly established in Claflin v. Housman, 93 U.S. 130, 23 L.Ed. 833, where the bankruptcy act, Rev.Stats. 5047, gave the assignee, in his own name, the power to recover all the debts due the bankrupt, and under Sec. 4972 the United States district court was given jurisdiction:

"First. To all cases and controversies arising between the bankrupt and any creditor or creditors who shall claim any debt or demand under the bankruptcy.

"Second. To the collection of all the assets of the bankrupt."

The question there was whether the conferring of jurisdiction on the federal courts to entertain such suits by the assignee confined him to that jurisdiction. The Supreme Court held that, although an act of Congress conferred jurisdiction in such suits on the federal courts, the state courts had jurisdiction to entertain them unless, in addition to conferring jurisdiction on the federal courts, the act also excluded that of the state courts. The principle is stated 93 U.S. at page 135, 23 L.Ed. 833:

"* * * where jurisdiction may be conferred on the United States courts, it may be made exclusive where not so by the Constitution itself; but, if exclusive jurisdiction be neither *express nor implied,* the State courts have concurrent jurisdiction whenever, by their own constitution, they are competent to take it." (Emphasis supplied.) Cf. Galveston, etc., Ry. v. Wallace, 223 U.S. 481, 490, 32 S.Ct. 205, 56 L.Ed. 516; Healy v. Ratta, 292 U.S. 263, 271, 54 S.Ct. 700, 78 L.Ed. 1248; Western Fruit Growers v. United States, 9 Cir., 124 F.2d 381, 387.

Since the G.I. bill does not expressly deprive the veteran of suing in the state courts to recover under the rights conferred by 308(b) (B), the question becomes, Does the act deprive him of that right by implication?

■ The Supreme Court has held that the rights created by this act shall be liberally construed in favor of the veteran, Fishgold v. Sullivan Drydock Co., 328 U.S. 275, stating at page 285, 66 S.Ct. 1105, at page 1111, 90 L.Ed. 1230, 167 A.L.R. 110:

"This legislation is to be liberally construed for the benefit of those who left private life to serve their country in its hour of great need. * * * Our problem is to construe the *separate provisions* of the Act as parts of an organic whole and *give each as liberal a construction for the benefit of the veteran* as a harmonious interplay of the separate provisions permits." (Emphasis supplied.)

■ Though generally the jurisdiction of the federal courts is to be strictly construed, Healy v. Ratta, 292 U.S. 263, 273, 54 S.Ct. 700, 78 L.Ed. 1248, the second circuit, in determining the extent of its jurisdiction under the G.I. Bill of Rights, applies the liberal construction of the Fishgold case. Feore v. North Shore Bus Co., 2 Cir., 161 F.2d 552, 553.

It is apparent that a liberal construction permitting suits by the veteran in the state courts to recover under the right created in him would strongly favor him in many cases. For instance, a logger in Del Norte County, on the northern border of California, refused restoration by a lumber company there, well could be in a better posi-

tion to sue in the Del Norte County court. He would be saved the costly trip of nearly four hundred miles to San Francisco, first, to consult with the United States Attorney under Sec. 308(e) regarding a suit in the United States district court there, and if the United States Attorney so advises, then, second, all the costs of travel and hotel bills and loss of time of himself and witnesses to be brought to San Francisco for the trial. Similarly of a veteran miner refused restoration by a mining company in Inyo County, on California's eastern border, or a ditchtender in the Imperial Valley on the state's southern border. Such expense to present the veteran's case in a district court well may deprive him of any relief.

▮ Here is as liberal a construction for the benefit of the veteran as the "harmonious interplay of the separate provisions permits," Fishgold case, supra. He may sue in the nearby state court for the right created in him if it be the more advantageous method, or he may seek the distant federal court with its benefits if, in the balancing of expenditures, the latter costs the veteran less. As the Supreme Court states concerning the contention that a foreign diplomat may sue only in the Supreme Court because the Constitution gives him that jurisdiction, "to deprive an ambassador, public minister, or consul of the privilege of suing in any court he chose having jurisdiction of the parties and the subject matter of his action, *would be, in many cases, to convert what was intended as a favor into a burden.*" (Emphasis supplied.) Ames v. State of Kansas, 111 U.S. 449, 464, 4 S.Ct. 437, 444, 28 L.Ed. 482. See also Id. 311 U.S. page 468, 4 S.Ct. page 446.

In addition to California, the following state courts have exercised jurisdiction in cases brought by the veteran. Newman v. McCullough, 212 S.C. 17, 46 S.E.2d 252; Murphy v. Chrysler Corporation, 306 Mich. 610, 11 N.W.2d 261; Hanebuth v. Patton, 115 Colo. 166, 170 P.2d 526; In re Walker's Estate, 185 Misc. 1046, 53 N.Y.S.2d 106. There probably are many more such state court cases terminating in the trial courts and unreported.

It is not without significance that 28 U.S.C., as amended, 28 U.S.C.A., classified the jurisdiction for the litigation of certain federal legislation as exclusive, § 1333, Admiralty, maritime and prize cases; § 1334, Bankruptcy matters and proceedings; § 1338, Patents, copyrights, trade marks; § 1346, United States as defendant in suits arising under the Federal Tort Claims Act; § 1355, Fine, penalty or forfeiture; § 1356, Seizures not within admiralty and maritime jurisdiction. The G.I. Bill of Rights is not so classified.

The case is clearly distinguishable from the decisions on the Sherman Anti-Trust and Clayton Acts, 15 U.S.C.A. § 1 et seq. These acts make punishable as misdemeanors certain acts in restraint of interstate trade. No provision creates any general right in any private person, as Sec. 308(b) (B) of the Bill of Rights creates in a separate section the right of restoration to employment and for wages. These anti-trust acts certainly have not been held construable liberally in favor of the private litigant. The sole right they create in any person other than the government is the right to sue in the United States district courts. See General Inv. Co. v. Lake Shore & M. S. Ry. Co., 260 U.S. 261, at page 287, 43 S.Ct. 106, at page 117, 67 L. Ed. 244, where the opinion states, of the sole right in a private litigant: "This right to sue, however, is granted in terms which show that it is to be exercised only in a 'court of the United States.'"

Knox National Farm Loan Ass'n v. Phillips, 300 U.S. 194, 57 S.Ct. 418, 422, 81 L.Ed. 599, 108 A.L.R. 738, clearly shows another type of statute which necessarily by implication excludes the state jurisdiction. The question was whether the state court could wind up the business of the federally created National Farm Association. Of this, the Supreme Court stated "that a national farm loan association is an instrumentality of the federal government; that the time and manner of liquidation are governed by the federal statute; and that jurisdiction does not reside in the tribunals of a state to wind up the business of this governmental agency either by receivership or otherwise." This legislation is entirely different from the instant statute conferring rights on a private person and

which is to be liberally construed in his favor.

The judgment is reversed and the district court ordered to dismiss appellee's complaint.

STEPHENS, Circuit Judge (concurring in the result).

I concur in the result only, and in doing so I wish to note that I am not at all certain but that Congress intended to confine jurisdiction of litigation under the Act commonly called the "G.I. Bill of Rights" to the federal courts. It provided that the United States District Attorney should serve the "G.I." without cost and in this it seems quite improbable to me that Congress had in mind directing United States Attorneys to act in state court actions, bound to be extensive in numbers. The Act provides that the courts' services shall be free of costs to the returning service man and that actions under it shall be given a speedy hearing and shall receive preference on the court's calendar. Here, surely the Congress was thinking of federal courts for it could hardly assume to command the states in the matters of costs and in the handling of calendars in their courts. It may be argued that the "G.I." can select his forum and if he selects the state over the federal forum he knowingly waives the privileges granted him in the Act. Even if this be granted, it does not conclusively destroy the seeming intent of Congress that it was legislating with the view that litigation under its legislation would be in federal courts.

It is not clear to me, however, that the way is always open to the service man to select his forum if both state and federal courts have jurisdiction of his case. May the employer not do as he did in the instant case and draw the returning employee into the state court, "willy-nilly", by fast action in filing a declaratory judgment action? If so, the congressional intent to grant special advantages to those who fought for the government may be defeated.

As against these doubts I am aware of the broad general principle that state courts have concurrent or coordinate jurisdiction in federal matters unless Congress indicates otherwise in its legislation, either by direct provision or in a manner clearly inconsistent with it. I also take note of the fact that state courts have taken jurisdiction of these matters in numerous instances.

By so narrow a margin that abiding doubt remains, my decision falls in agreement with that reached by my associates.

PROCTER & GAMBLE MFG. CO. v. METCALF et al.

No. 11962.

United States Court of Appeals
Ninth Circuit.

March 16, 1949.

208

O'Melveny & Myers, Pierce Works, Richard C. Bergen and Howard J. Deards, all of Los Angeles, Cal., for appellant.

Lawrence M. Cahill, of Los Angeles, Cal., for appellees Day, and others.

Joseph Sattler, in pro. per.

Before MATHEWS and HEALY, Circuit Judges, and FEE, District Judge.

JAMES ALGER FEE, District Judge.

An appeal has been brought from an order of the District Court reversing, vacating and setting aside an order by the referee in bankruptcy, which empowered the trustee to sell certain real property at private sale, and in the same document confirmed the sale so made. The order appealed from also adjudged the referee was acting beyond his jurisdiction in ordering the payment of a commission to a real estate broker.

The proceeding before the referee was initiated by a petition to sell a piece of real property upon which there was a producing oil well which had been leased to third parties theretofore. Objections were filed and a hearing held. At the end of the proceeding, the order was made confirming the sale. The distinction between the order for which the proceeding was initiated and that which was obtained was procedural but fundamental. The attempt has been made to confer upon the order a finality which it could not obtain if it were simply an order approving the terms of a sale.

The District Judge held a lengthy hearing, at which it developed that the conditions had changed since the price of oil had increased. The lease was yielding considerable royalties to the estate in bankruptcy. The question arose as to whether, under the terms of the contract to sell the reversion, this revenue might not be cut off entirely from the estate in bankruptcy. The trustee, who had petitioned for the sale, had decided that he had not sufficiently protected bankrupt. Furthermore, it was plain that the stipulations of the contract of sale, confirmed by the referee, left the bankrupt at the mercy of the purchaser and did not adequately prevent an opportunity to maneuver, so that it might be foreclosed of any right to obtain royalties from oil, which were bringing in substantial returns. While there is no fraud shown on the part of the purchaser, this circumstance of lack of protection was of great importance.

Throughout the hearing, suggestions were made by the purchaser that in some indefinite time and way it would agree to stipulations which would cure this inadequacy of protection. But there was no definite proposal to this effect. It seems

purchaser, if in good faith, could have made such proposal upon the record and the court might then have held the proposal was adequate.

 There are no formalistic rules in this matter which are to be enforced at all events. The matter is almost wholly in the discretion of the District Judge. Here a lengthy hearing was held and testimony taken by him. Appellant attributes cabalistic significance to the order of confirmation by the referee. But there are no terms in bankruptcy and the referee might have vacated this order at any time if convinced it was erroneous. But the petition for review was promptly filed. The statute[1] gives the privilege of petitioning for review of any order of the referee. If the contention of appellant were correct, the statute should have excepted orders confirming sales from review. But it was not the intention of the lawmakers that such orders should be chiseled on tablets of stone. The District Judge had the power to review the order. This jurisdiction permitted him to affirm the order or to set it aside, as the facts and legal principles might require.

 Many opinions use language which indicates that a sale confirmed cannot be set aside for inadequate consideration alone.[2] But there are often other compelling reasons for the actual holding. For instance, the appeal of an unsuccessful bidder for relief from a confirmed sale to another is open to the obvious objection that such a bidder has no interest.[3] Furthermore, where the District Judge presides and himself approves and confirms a sale, there is good reason to say he should not be permitted to change his mind unless fraud is present.[4] But where review has been taken from the order of the referee, reversal thereof by the District Judge leaves the prospective purchaser in the same situation as if the referee had refused confirmation.[5] Where there are even slight circumstances which suggest that there is unfairness to the estate in bankruptcy, a careful consideration should be had on review and a confirmed sale should be set aside if necessary to rectify the situation. While, if referee and District Judge agree, an appellate court will rarely interfere,[6] the District Judge has the responsibility to see that a sale which leaves the estate unprotected should not be confirmed.[7]

There is a general policy which emphasizes the stability of judicial sales as of great importance in smooth and correct judicial administration. Balancing that, it is of overwhelming importance that the rights of creditors in a concern in bankruptcy should be protected and that a disposal of property on terms which violate the rule should not be permitted to stand.

 In review of the situation, there seem to be a great many things which cannot be understood from the cold record. None of the parties involved seem quite to measure up to what might be expected. The numerous continuances and grants of time to the creditors throughout the bankruptcy proceeding throw suspicion upon motivation. On the other hand, a principle is often applied in judicial sales that a sale will not be set aside unless there is a bona fide offer of a substantially higher price. Although the District Judge extended time in the apparent hope that one would be so obtained, no such situation developed. Appellant assigns as error that the District Judge did not grant another such continuance. But it is apparent that the District Judge thought advantage was taken of his leniency. There were indications this was true.

Under the circumstances, the District Judge became suspicious, with apparent cause, of the whole situation. His avoidance of the sale was proper and is affirmed. However, we do not indicate thereby that

[1] 11 U.S.C.A. § 67, sub. c.

[4] In re Burr Mfg. & Supply Co., 2 Cir., 217 F. 16; See also Sturgiss v. Corbin, 4 Cir., 141 F. 1; In re Stanley Engineering Corporation, 3 Cir., 164 F.2d 316.